IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

IN THE MATTER OF:             )
                                        )        CASE NO. BK07-42079-TLS
JANELLE GRACE COLFACK,      )             A08-4009-TLS
a/k/a Janelle Counsell, a/k/a Janelle Millhouse, )
                                        )
           Debtor(s).       )         CH. 7
HELEN H. COUNSELL, individually and   )
as co-trustee of the Wendell G. Counsell and )
Helen H. Counsell Revocable Trust, and   )
MARY C. HUEY, as co-trustee of the Wendell )
G. Counsell and Helen H. Counsell Revocable )
Trust,                                )
                                        )
           Plaintiffs,      )
                                        )
     vs.                    )
                                        )
JANELLE GRACE COLFACK,      )
a/k/a Janelle Counsell, a/k/a Janelle Millhouse, )
                                        )
           Defendant.     )

## ORDER

    This matter is before the court on cross-motions for summary judgment by the debtor-defendant (Fil. #17) and the plaintiffs (Fil. #21). Paul Conley represents the debtor, and Randall V. Petersen represents the plaintiffs. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motions were taken under advisement without oral arguments.

    The plaintiffs' motion is granted, and a separate judgment will be entered in their favor. The debtor-defendant's motion is denied.

## I.  BACKGROUND

    The plaintiffs are co-trustees of a revocable express trust. The plaintiff Mrs. Counsell is also a beneficiary of the trust. The debtor-defendant was a successor trustee of the trust. The plaintiffs obtained a state court judgment in Utah in 2007 against the debtor for her wrongful retention of trust property after the settlors revoked the trust. The Utah court did not find that any trust funds had disappeared or were otherwise unaccounted for while in the debtor's custody; rather, the court found that the debtor, in a good-faith belief she was protecting the beneficiaries, simply refused to turn over the trust res when the settlors revoked the trust and terminated her as trustee.

The judgment was entered on July 2, 2007, in the amount of $81,009.24 plus interest at 10% per annum, which represents compensatory damages of $14,097.08, the repayment of a $15,000 loan from the trust, interest, and attorney fees and costs totaling $34,256.50. The plaintiffs registered the judgment in Nebraska in September 2007. The debtor filed her Chapter 7 bankruptcy petition in this district on November 1, 2007, and received a discharge of her debts on February 22, 2008. The plaintiffs assert in this lawsuit that the debt represented by the judgment was not discharged pursuant to 11 U.S.C. § 523(a)(4).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 868 (8th Cir.2005); *Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 371 F.3d 397, 401 (8th Cir.2004); *Williams v. Marlar (In re Marlar)*, 267 F.3d 749, 755 (8th Cir. 2001).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "We look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248); *Ries v. Wintz Props., Inc. (In re Wintz Cos.)*, 230 B.R. 848, 858 (B.A.P. 8th Cir. 1999).

## III.  COLLATERAL ESTOPPEL EFFECT OF STATE COURT JUDGMENT

A state court action to establish a debt is separate from a determination of the dischargeability of that debt in bankruptcy. *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 609 (B.A.P. 8th Cir. 1997). The bankruptcy court has exclusive jurisdiction to determine whether debts for a debtor's fiduciary or non-fiduciary fraud, embezzlement, larceny, or willful and malicious injury are non-dischargeable. 11 U.S.C. § 523(c); *Zio Johnos, Inc. v. Ziadeh (In re Ziadeh)*, 276 B.R. 614, 619 (Bankr. N.D. Iowa 2002). Therefore, the court must review the state court judgment to see whether it establishes the elements of a prima facie case under § 523. *Hobson Mould Works, Inc. v. Madsen (In re Madsen)*, 195 F.3d 988, 989-90 (8th Cir. 1999).

When the parties have previously litigated an issue in a state court, the bankruptcy court will look to state law to determine the preclusive effect of that judgment. *Madsen*, 195 F.3d at 989-90; *Jacobus v. Binns (In re Binns)*, 328 B.R. 126, 129 (B.A.P. 8th Cir. 2005). In Nebraska, res judicata bars relitigation of any right, fact, or matter directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions. *Ichtertz v. Orthopaedic Specialists of Nebraska, P.C.*, 730 N.W.2d 798, 804 (Neb. 2007).

## IV.  FACTUAL FINDINGS

The relevant facts are taken from the Utah memorandum decision and are as follows:

1.  The trust at issue is the Wendell G. Counsell and Helen H. Counsell Revocable Trust.

2.  In 1978, Helen invested money she received from her mother in an investment account with the stock brokerage firm of Kirkpatrick, Pettis, Smith and Polian, Inc. ("Kirkpatrick Pettis").

3.  Over the ensuing years Helen continued to contribute money to the Kirkpatrick Pettis account, including money from the sale of houses she owned in Lincoln, Nebraska.

4.  Helen and Wendell married on July 20, 1980. The marriage was not the first for either of the parties. Helen had three children from a previous marriage: Gweneth, Joleen, and Lori. Wendell also had three children from a previous marriage: Janelle, Barbara, and Rodney.

5.  At the time of their marriage, Wendell owned two houses in Lincoln, Nebraska. He lived in one and maintained the other home as a rental property.

6.  After their marriage, Wendell sold his Lincoln houses. He used a portion of the money to purchase a fifth-wheel trailer. Helen and Wendell used the trailer to travel around the country. The remainder of the funds were placed in Helen's Kirkpatrick Pettis account.

7.  In 1997 Helen and Wendell moved from Lincoln, Nebraska, to Charlottesville, Virginia, where they lived in the basement of a home owned by Helen's daughter, Gweneth.

8.  In 1986 – more than ten years before the move – Wendell was diagnosed with asthma. The medication Wendell was required to take to manage his asthma was expensive and he was tempted not to purchase it.

9.  In early 1997, concerned for his father's health, Rodney Counsell suggested that Helen and Wendell place their assets in a trust fund and name Rodney as the trustee, so that he could then pay Wendell's medication bills from the money in the trust account. The idea was that Wendell would not see the bills, would not have knowledge of the costs of his medication, and would, therefore, be more likely to take the medication without being constantly reminded of its high cost.

-3-

10.  Helen, Wendell, and Rodney additionally decided that Rodney would make payments on several other specific bills and would provide Helen and Wendell with money for traveling, car purchases, and other purchases, as requested by Helen and Wendell. They signed the trust document on April 28, 1997. Rodney signed the trust as the trustee on May 5, 1997, in Omaha, Nebraska.

11.  The trust was funded with funds from both Helen and Wendell. The corpus of the trust included all of the grantors' assets, specifically including the cash in three bank accounts, individual retirement accounts, all securities held in the Kirkpatrick Pettis account, a life insurance policy, and the following receivables: a land contract for a house on 51st Street in Lincoln, Nebraska, from Janelle Counsell Fenton, in the amount of $25,000; a note receivable from Janelle Counsell Fenton, in the amount of $7,608.31; and a note receivable from Gweneth L. West, in the amount of $7,672.88. Wendell and Helen's retirement funds were also directly deposited into the trust account.

12.  The trust provided that any distribution of the assets among Helen and Wendell's six children was to occur only after the death of both Helen and Wendell.

13.  In creating the revocable trust, Helen and Wendell, as grantors, specifically "reserve[d] the right to amend, modify, and revoke [the] trust in whole or in part at any time and from time to time." If Helen and Wendell invoked their delineated right to revoke the trust, Rodney, or any other successor trustee, was required to return to Helen and Wendell any or all of the assets requested.

14.  Helen's investments with Kirkpatrick Pettis became the substantive part of the trust property and her account was accordingly re-titled from Helen H. Counsell, Gweneth L. West and Wendell G. Counsell, Joint Tenants, to Wendell G. and Helen H. Counsell Revocable Trust, Rodney G. Counsell, Trustee.

15.  Rodney's power as trustee under the trust was broad. The trust gave Rodney full discretionary power to apply "the income and principal of the trust as the Trustee deems necessary or advisable for the Grantors' care, comfort and welfare." The trust did not require Rodney to obtain court approval before performing his duties in caring for the property of Helen and Wendell as long as it was an "act which a prudent person might perform in dealing with the property of another."

16.  The trust terms also established a successor trustee in the event that Rodney could no longer serve as trustee. The trust document provided to the court by the parties names Janelle and Ken Pratry as the successor trustees to the trust.

17.  Ken Pratry was an accountant and an associate of Rodney.

18.  Helen and Wendell maintained separate from the trust their social security receipts and a separate bank account for incidentals and day-to-day expenses. They also placed into this separate account the income from the various jobs they worked.

-4-

19.   Although Rodney did not give any written accountings to Helen and Wendell of his management of the trust, he provided them with oral updates on the status of the funds. Specifically, Rodney assured Helen and Wendell that the trust property was still there and that there were sufficient funds for them to take a cruise every year.

20.   With respect to the land contract receivable related to Janelle, Helen and Wendell executed a special warranty deed on May 12, 1997, granting Lot 51 in Lincoln, Nebraska to Janelle G. Fenton. The parties understood that Janelle would pay Helen and Wendell $25,000 once she sold the property.

21.   On March 6, 1998, Janelle wrote a check for $25,800 to Rodney as payment fulfilling her debt to the trust for the $25,000 loaned to her by Helen and Wendell Counsell. Rodney deposited this check in the trust's account.

22.   Pursuant to their arrangement, Wendell and Helen had most of their bills mailed directly to Rodney, who then would pay them. When Helen and Wendell needed additional money, such as for cars or vacations, Wendell and Helen would ask Rodney for the money and he would give it to them at that time.

23.   On August 8, 2000, Rodney created a joint securities account in his and Janelle's names. This account was not designated as a trust account or otherwise indicated to be for the benefit of Helen and Wendell. Janelle signed the creating document, understanding that she was added to the account solely in order to take care of the account in the event that something might happen to Rodney. Janelle did not assume any of the trust duties performed by Rodney at this time, nor did she take any active role in the preservation of the trust or the management of this new account.

24.   On August 9,2000, Rodney wrote a letter to Kirkpatrick Pettis and requested the transfer of all securities from the trust account to the joint securities account.

25.   Neither Rodney nor Janelle disclosed this transfer of funds to Helen or Wendell. However, from this new account, Rodney continued to make bill payments for Helen and Wendell and to distribute funds to Helen and Wendell when requested for other purchases and trips.

26.   Over time, the mandatory bill payments and requested funds depleted the funds available in the securities account.

27.   On May 24, 2001, Rodney withdrew $15,682.39 from the Kirkpatrick Pettis account as a loan for Janelle. Janelle testified at trial that the $15,000 loan was meant to be a temporary one- to two-month loan to pay off her car in order to help her qualify for a refinance of her real property. The loan was created through a margin agreement for $15,000 on the Kirkpatrick Pettis account.

28.   Rodney unexpectedly passed away on June 7, 2001. At no time had he provided Janelle with any significant instruction as to the management of the trust and the joint interest account.

29.  Soon after, Helen inquired into what was going on with the trust. Janelle indicated that she was "on the trust as trustee." At that time, Janelle did not know anything about the trust, except her understanding that it had been entered into as a means to make sure her dad continued to take his medication.

30.  After Rodney's death, Ken Pratry declined to serve as a co-trustee on the trust.

31.  Janelle transferred the funds from the joint account into an individual securities account solely in her name.

32.  In a letter sent to Janelle on July 18, 2001, Helen and Wendell wrote: "The arrangement as now exists may be exactly the right one and exactly what we need BUT we need some facts and information before we can make this judgment."

33.  Helen and Wendell first revoked the trust on August 16, 2001, in a letter sent to Janelle: "We intend to re-establish our trust in Virginia, naming our accountant, Mary Huey, as co-trustee. If there is any doubt as to the status of the Nebraska trust or your status as trustee, please be clear that we revoke the 1997 trust agreement and that we do not consider you to be successor trustee of our trust assets."

34.  In that letter, Wendell and Helen terminated Janelle as trustee of their trust and requested the immediate return of all funds.

35.  Return of the trust funds was also specifically requested by letters dated October 11, 2001, and September 15, 2003, from Wendell and Helen's lawyer to Janelle.

36.  On September 10, 2002, Janelle attempted to resolve the dispute by paying $10,000 to Helen, and on January 23, 2003, she paid another $8,000 to Helen, for a total of $18,000, which she later asserted was Helen's half of the remaining trust assets. Janelle believed the two payments were necessary to avoid gift taxes since the funds were legally in her name. Janelle kept what she believed was Wendell's portion of the funds.

37.  Additionally, before dividing the funds between Helen and Wendell, Janelle added the $15,000 she received earlier by loan from the account to the $21,000 in her individual Kirkpatrick Pettis account. She then divided the resulting $36,000 amount to arrive at $18,000 as "Helen's half" of the remaining assets.

38.  After trial, the Utah district court awarded Helen the sum of $46,752.74 in compensatory damages, $33,686.17 in attorney fees, and $570.33 in court costs for a total award of $81,009.24, to accrue interest at 10% per annum after August 9, 2007.

39.  The compensatory damages were based on the value of the trust funds at the time Wendell and Helen revoked the trust on August 16, 2001. The court credited Janelle for the $18,000 she had already paid to Helen and the $12,659 she had paid to or on behalf of Wendell and Helen

for various expenses. The court found that Janelle owed $29,097.08 in compensatory damages. With interest to the date of judgment, the amount came to $46,752.74.

40.   The court declined to award punitive damages, finding that "Janelle in good faith attempted to manage the trust funds and act consistent with her understanding" of her duties under the trust and her responsibilities to Helen and Wendell. The court went on to state: "[Janelle's] emails [to Helen, Wendell, and other family members] provide no evidence of self-dealing, but rather an attempt to ensure the funds were properly administered."

41. Finally, the court awarded Helen a portion of her attorney fees pursuant to the Utah Trust Code, in which the court, "as justice and equity may require," may award costs and expenses to any party in a judicial proceeding involving the administration of a trust, to be paid by another party or from the trust. The court specifically based the award on Janelle's failure to return the trust money to Wendell and Helen after they revoked the trust, and on her failure to repay the $15,000 loan. Because the court had awarded Helen approximately one-half of the amount she sought in compensatory damages, it awarded her one-half of her attorney fees and costs, observing that "Helen has financial need and cannot afford to pay all of the attorney's fees required to bring this matter to trial, while Janelle is gainfully employed and is capable of assisting Helen in this matter."

## V.  11 U.S.C. § 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. To prevail, a plaintiff must establish by a preponderance of the evidence that a fiduciary relationship existed between the parties and that the defendant committed defalcation in the course of that fiduciary relationship. *Jafarpour v. Shahrokhi (In re Shahrokhi)*, 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001).

### A.    Plaintiffs' motion for summary judgment

Whether a relationship is a fiduciary relationship within the meaning of § 523(a)(4) is a question of federal law. *Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). "Acting in a fiduciary capacity" is limited in application to technical or express trusts, not to trusts that may be imposed because of the alleged act of wrongdoing from which the underlying indebtedness arose. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934) (stating that the scope of the discharge exception is to be limited to technical trusts, not implied or constructive trusts); *Hunter v. Philpott*, 373 F.3d 873 (8th Cir. 2004) (stating "fiduciary" is used in a strict and narrow sense in § 523(a)(4), and fiduciary status must pre-date the debt); *Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 878-79 (8th Cir. 1985) (holding that for purposes of § 523(a)(4) fraud or defalcation exception, fiduciary capacity must arise from express trust, not constructive trust or mere contractual relationship).

Exception from discharge is "another token of the law's imposition of the highest standard of loyalty and care on trustees. In a trust relationship the settlor and beneficiary repose 'trust' in a

literal sense in the trustee, and the abuse of that trust is considered a serious wrong." *Illinois Dep't of the Lottery v. Marchiando (In re Marchiando)*, 13 F.3d 1111, 1115 (7th Cir. 1994).

Under Utah law, a trust is a fiduciary relationship with respect to property subjecting the person by whom the title to the property is held (the trustee) to equitable duties to deal with the property for the benefit of another person (the beneficiary), which arise as a result of a manifestation by the settlor of an intention to create it. *Flake v. Flake (In re Estate of Flake)*, 71 P.3d 589, 594 (Utah 2003).

In this case, no one disputes that the debtor was acting in a fiduciary capacity when she took the actions – as trustee of an express trust – for which the state court judgment against her was entered. The pertinent question then becomes whether the debtor's conduct constitutes a defalcation, as that term is used in the Bankruptcy Code.

According to the caselaw in the Eighth Circuit, a bankruptcy court can find a "defalcation" under 11 U.S.C. § 523(a)(4) without evidence of bad faith, intentional fraud, or other intentional wrongdoing. The Eighth Circuit Court of Appeals has stated:

> Defalcation is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." Under section 523(a)(4), defalcation "includes the innocent default of a fiduciary who fails to account fully for money received." . . . An individual may be liable for defalcation without having the intent to defraud.

*Cochrane*, 124 F.3d at 984 (quoting *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996)). *See also Hunter v. Philpott*, 373 F.3d at 875 n.1 (defalcation is generally considered to be a failure to account for money or property that has been entrusted to one).

The phrase "failure to account for" trust property has been interpreted to mean property is missing or the fiduciary has failed to pay it over as he ought. *Zohlman v. Zoldan*, 226 B.R. 767, 777 n.8 (S.D.N.Y. 1998). A failure to apply funds entrusted to a fiduciary in accordance with the terms of the trust is a defalcation, whether intentional or not. *Int'l Fid. Ins. Co. v. Herndon (In re Herndon)*, 277 B.R. 765, 769 (Bankr. E.D. Ark. 2002).

The Eighth Circuit appears to be among the minority of courts with such a strict interpretation of defalcation. Many cases that have found a defalcation by a fiduciary of an express trust seem to have done so on the basis of a misappropriation of funds or some willful act. *See, e.g.*, *Banks v. Gill Distrib. Ctrs., Inc.*, 263 F.3d 862 (9th Cir. 2001) (attorney's failure to remit judgment proceeds to third party in attempt to pressure third party to accept less than he was owed and thereby increase attorney's compensation was a breach of his fiduciary duty to client); *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177 (5th Cir. 1997) (defalcation may not require actual intent, but it does require some level of mental culpability; the Fifth Circuit follows a recklessness standard); *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994) (after surveying the breadth of caselaw attempting to define defalcation, the court concluded that a mere negligent breach of a fiduciary duty is not a defalcation,

-8-

on the basis that exceptions to discharge are to be strictly construed in the debtor's favor); *Lovell v. Stanifer (In re Stanifer)*, 236 B.R. 709 (B.A.P. 9th Cir. 1999) (debtor's failure to pay to former wife, until ordered to do so, certain pension fund proceeds which were entrusted to him as fiduciary under California law was a defalcation); *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283 (B.A.P. 10th Cir. 1997) (defalcation is a fiduciary's failure to account for funds entrusted to him due to any breach of a fiduciary duty, whether intentional, willful, reckless, or negligent); *San Saba Pecan, Inc. v. Failing (In re Failing)*, 124 B.R. 340 (W.D. Okla. 1989) (lender's president committed defalcation by failing to return borrower's loan commitment deposit when lender was unable to arrange financing); *Pan Am. World Airways, Inc. v. Folliard (In re Folliard)*, 10 B.R. 875 (D. Md. 1981) (if corporate officer and shareholder personally participated in breach of express trust, his personal liability for the loss is non-dischargeable whether or not he obtained any personal gain); *Mohr v. Tatro (In re Tatro)*, 387 B.R. 833 (Bankr. D. Kan. 2008) (if parent spent minor child's trust fund money to support the child, he may have committed defalcation because payment of support is his legal obligation), *but see Okla Grocers Ass'n, Inc. v. Millikan (In re Millikan)*, 2006 WL 1755960, 188 Fed. Appx. 699 (10th Cir. 2006) (noting disparate definitions of defalcation and stating that it requires, at minimum, "some portion of misconduct"); *Pritchard Concrete, Inc. v. Barnes (In re Barnes)*, 377 B.R. 289 (Bankr. D. Colo. 2007) (the disappearance of loan proceeds is a failure to account for money entrusted to fiduciary and therefore constitutes a defalcation); *Estate of Lola Brewer v. Jones (In re Jones)*, 369 B.R. 340 (Bankr. N.D. Ohio 2007) (financial planner's withdrawal of client funds for his personal benefit is a defalcation); *Wright v. Gulf Ins. Co. (In re Wright)*, 266 B.R. 848 (Bankr. E.D. Ark. 2001) (noting that fraudulent or malicious intent is not required to find defalcation, but something more than mere negligence or innocent mistake must be shown).

A Second Circuit case which considered defalcation under the congruent provision of the Bankruptcy Act delineated the scope of the term in a manner quoted by many courts across the country:

> Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in [the early bankruptcy] context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts. . . .
>     . . .
>     . . . We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; in *[In] re Bernard*, 87 F.2d 705, 707 [ (2nd Cir. 1937) ], we said that "the misappropriation must be due to a known breach of duty, and not to mere negligence or mistake." Although [misappropriation] probably carries a larger implication of misconduct than "defalcation," "defalcation" may demand some portion of misconduct; we will assume arguendo that it does.
>     All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps not even a "misappropriation."

*Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir. 1937).

The Second Circuit subsequently clarified in a recent case that a creditor must meet a high standard, holding that a non-dischargeable defalcation requires proof of conscious misbehavior or extreme recklessness. *Denton v. Hyman (In re Hyman)*, 502 F.3d 61 (2d Cir. 2007). This criterion thus "ensures that the term 'defalcation' complements but does not dilute the other terms of the provision – 'fraud,' 'embezzlement,' and 'larceny' – all of which require a showing of actual wrongful intent." *Id.* at 68. "By requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard we adopt today insures that the harsh sanction of non-dischargeability is reserved for those who exhibit 'some portion of misconduct.'" *Id.* at 68-69. The court went on to state that such a standard would not reach debtor-fiduciaries "who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable." *Id.* at 69.

Nevertheless, Eighth Circuit precedent mandates that even the innocent default of a fiduciary who fails to account fully for trust property constitutes a defalcation. Because it is clear from the Utah opinion and judgment that the debtor failed to turn over trust assets upon request, the debt was incurred through the defalcation of her fiduciary duty. Therefore, it is not dischargeable under § 523(a)(4).

B.    Debtor-defendant's motion for summary judgment

The debtor argues that because the Utah court found she acted in good faith, she should not be held to have committed a defalcation. As the Eighth Circuit caselaw cited above makes clear, a debtor's intent is irrelevant for this particular exception to discharge.

The debtor also argues that the Utah court improperly calculated the interest due on the judgment, and improperly assessed attorney fees and costs. In essence, this argument is an attempt to challenge the state court decision in federal court. Such a tactic is generally prohibited by the *Rooker-Feldman* doctrine, which precludes lower federal courts from deciding a collateral attack on a state court decision. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Lower federal courts, including bankruptcy courts, lack subject matter jurisdiction to engage in appellate review of state court determinations. *Goetzman v. Agribank, FCB (In re Goetzman)*, 91 F.3d 1173, 1177 (8th Cir. 1996) (citing *Keene Corp. v. Cass*, 908 F.2d 293, 296 (8th Cir. 1990)). The scope of the *Rooker-Feldman* doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

In determining whether *Rooker-Feldman* applies, the court must ascertain whether the party bringing the claim is seeking what in essence would be an appellate review of a state court decision. *Car Color & Supply, Inc. v. Raffel (In re Raffel)*, 283 B.R. 746, 748 (B.A.P. 8th Cir. 2002) (citing

*Lemonds v. St. Louis County*, 222 F.3d 488, 492 (8th Cir. 2000) (*Rooker-Feldman* "forecloses not only straightforward appeals but also more indirect attempts by federal plaintiffs to undermine state court decisions.")).

In this case, the debtor is seeking to revisit the state court's findings in the context of this dischargeability action. That clearly is precluded by *Rooker-Feldman*. *See Portwood v. Young (In re Portwood)*, 308 B.R. 351, 355 (B.A.P. 8th Cir. 2004) (debtor should have contested contents of divorce decree via state court appeal, not in bankruptcy court).

The debtor does not otherwise raise any arguments suggesting discharge of the debt is merited, so her motion for summary judgment must be denied.

## VI.  CONCLUSION

The Utah litigation involved the same parties as this lawsuit does. That court had appropriate jurisdiction over the matter, and entered final judgment after a trial on the merits. Therefore, the Utah decision finding that the debtor wrongfully retained the trust property of which she was trustee and awarding damages to the trust beneficiary precludes relitigation of the matter in this court, and is sufficient to except the debt from discharge as a defalcation while acting in a fiduciary capacity.

IT IS ORDERED: The debtor-defendant's motion for summary judgment (Fil. #17) is denied. The plaintiffs' motion for summary judgment (Fil. #21) is granted. Separate judgment will be entered.

DATED:  August 19, 2008.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *Paul Conley
    *Randall V. Petersen
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.

-11-